CONSUMERS ENERGY COMPANY v PUBLIC
SERVICE COMMISSION

Docket No. 253316. Submitted August 3, 2005, at Lansing. Decided
September 13, 2005, at 9:10 a.m.

Consumers Energy Company filed an application with the Public
Service Commission, seeking in part a determination of its net
stranded costs for 2000 and 2001. The commission entered an
opinion and order that included a determination that certain costs
claimed for compliance with the Clean Air Act were statutorily
required to be accrued and deferred for recovery rather than
recovered as net stranded costs for those years. The commission
also continued to require a credit to offset securitization charges
imposed on Consumers' retail open access (ROA) customers, which
are customers who select an alternative supplier of electric gen-
eration services. Consumers appealed.

The Court of Appeals *held*:

1. MCL 460.10d(4) requires that certain capital expendi-
tures, such as the Clean Air Act costs at issue, be accrued and
deferred for recovery on or after January 1, 2004. Thus, those
costs could not have been included in the commission's calcu-
lation of stranded costs in the 2002 order in this matter because
the statute provides for the commission's determination of the
amount of those costs in proceedings to begin on or after
January 1, 2004.

2. The doctrines of res judicata and collateral estoppel do not
apply to the fixing and regulating of rates by the commission
because that is a legislative rather than a judicial function. The
relevant determinations by the PSC regarding the securitization
offset for ROA customers were part of its ratemaking function
because they directly related to the overall rates to be paid by those
customers.

3. The securitization scheme allows electrical utilities to re-
cover their "qualified costs" by imposing securitization charges on
their customers, including ROA customers. When it authorized
Consumers' securitization bonds, the commission also required
that ROA customers were to receive a credit to offset their
securitization charges. Contrary to Consumers' argument, MCL

460.10d(6) and (7) do not require excess securitization savings to be used first to achieve a five percent rate reduction for all customers, but allow the use of those savings to reduce charges related to the recovery of a utility's stranded costs. The commission, however, improperly treated the ROA customers' securitization charges as involving entirely the recovery of stranded costs for purposes of the offset to reduce those charges. Not all qualified costs recoverable in this manner constitute stranded costs. MCL 460.10d(6) authorizes the use of excess securitization savings to offset securitization charges only to the extent that those securitization charges involved a recovery of stranded costs. The commission considered all the qualified costs making up the securitization charges to be stranded costs, without determining whether some of the qualified costs were not and limiting the reduction to that portion of securitization charges attributable to stranded costs. The commission thus erred by allowing the securitization offset for ROA customers at issue to the extent that it was based on qualified costs that did not constitute stranded costs. This matter must be remanded to the commission for it to decide how to modify its treatment of the matter in light of this error.

Affirmed in part and reversed in part; remanded for further proceedings.

PUBLIC UTILITIES — ELECTRIC UTILITIES — RETAIL OPEN ACCESS PROGRAMS — SECURITIZATION CHARGES AND SAVINGS.

Excess securitization savings realized in connection with a retail open access program allowing the use of alternative suppliers of electric generation services may be used to offset the securitization charges paid by an electric utility's customers only to the extent that those charges involved a recovery of the utility's stranded costs; not all qualified costs an electric utility is authorized to recover through securitization charges constitute stranded costs (MCL 460.10d[6], 460.10h[g]).

*David A. Mikelonis* and *Jon R. Robinson* for Consumers Energy Company.

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, and *David A. Voges* and *Michael A. Nickerson*, Assistant Attorneys General, for the Public Service Commission.

*Michael A. Cox*, Attorney General, *Paul F. Novak*, Assistant in Charge, and *Donald E. Erickson*, Assistant Attorney General, for the Attorney General.

Before: COOPER, P.J., and BANDSTRA and KELLY, JJ.

PER CURIAM. Consumers Energy Company appeals as of right an opinion and order of the Public Service Commission regarding Consumers' application for determination of its net stranded costs for 2000 and 2001. We affirm in part, reverse in part, and remand for further proceedings.

I. BACKGROUND

This appeal involves two aspects of the PSC's decisions. First, Consumers challenges the PSC's conclusion that certain costs claimed for compliance with the federal Clean Air Act were statutorily required to be accrued and deferred for recovery rather than recovered as part of a recovery of net stranded costs for 2000 and 2001.

The second issue relates to competition in the provision of electric generation services in Michigan introduced through a retail open access (ROA) program. As background, in 2000 the Legislature enacted the Customer Choice and Electricity Reliability Act (the Act), 2000 PA 141 and 2000 PA 142, MCL 460.10 *et seq.,* which authorized the establishment by the PSC of ROA programs under which retail electric customers could buy electric generation services from alternative suppliers, as opposed to incumbent utilities such as Consumers. See, generally, *Detroit Edison Co v Pub Service Comm No 2*, 261 Mich App 448, 449-450; 683 NW2d 679 (2004). Essentially, in connection with Consumers' ROA program and as contemplated by the Act, Consum-

ers issued securitization bonds, with the PSC's authorization, to provide funding for certain costs and, correspondingly, imposed securitization charges on its retail electric customers. But the PSC directed in its order authorizing the bonds that Consumers' ROA customers, i.e., customers who selected an alternative electric supplier, were to receive a credit to offset their securitization charges. Consumers challenges the legality of the PSC's decision to continue this securitization offset for ROA customers.

## II. APPLICABLE STANDARDS OF REVIEW

The scope of appellate review of PSC orders is narrow. *In re MCI Telecom Complaint*, 255 Mich App 361, 365; 661 NW2d 611 (2003). Under MCL 462.26(8), a party challenging an order of the PSC has the burden of proving by clear and satisfactory evidence that the order is unlawful or unreasonable. *In re MCI, supra* at 365. A PSC decision is unlawful when it involves an erroneous interpretation or application of the law. *Id.* An order is unreasonable if it is not supported by the evidence. *Id.* Also, a reviewing court should give due deference to the PSC's administrative expertise and should not substitute its judgment for that of the PSC. *In re Michigan Cable Telecom Ass'n Complaint*, 239 Mich App 686, 690; 609 NW2d 854 (2000).

Questions of statutory interpretation remain subject to review de novo. *Id.* While courts should nevertheless give great weight to any reasonable construction by the PSC of a regulatory scheme that it is empowered to administer, *Champion's Auto Ferry, Inc v Pub Service Comm*, 231 Mich App 699, 708; 588 NW2d 153 (1998), a court should not abandon or delegate its responsibility

to determine legislative intent, *Miller Bros v Pub Service Comm*, 180 Mich App 227, 232; 446 NW2d 640 (1989).

### III. CLEAN AIR ACT COSTS

Consumers first argues that the PSC erred by excluding Clean Air Act costs from the calculation of Consumers' stranded costs for 2000 and 2001. We disagree.

MCL 460.10d(4)[1] provides:

> Beginning January 1, 2004, *annual return of and on capital expenditures in excess of depreciation levels incurred during and before the time period described in [MCL 460.10d(2)]*, and expenses incurred as a result of changes in taxes, laws, or other state or federal governmental actions incurred by electric utilities during the period described in [MCL 460.10d(2)], *shall be accrued and deferred for recovery.* After notice and hearing, the commission [the PSC] shall determine the amount of reasonable and prudent costs, if any, to be recovered and the recovery period, which shall not exceed 5 years, and shall not commence until after the expiration of the period described in [MCL 460.10d(2)]. [Emphasis added.]

The term "shall" unambiguously denotes mandatory, rather than discretionary, action. *Roberts v Mecosta Co Gen Hosp*, 466 Mich 57, 65; 642 NW2d 663 (2002). Accordingly, by the plain language of MCL 460.10d(4), Consumers' "capital expenditures in excess of depreciation levels" had to be accrued and deferred for recovery on or after January 1, 2004. It is undisputed that the Clean Air Act costs at issue were capital expenditures.[2]

---

[1] When the PSC opinion and order on appeal was issued, this statutory provision was codified with identical language as MCL 460.10d(3). We refer to this statutory provision by its current codification as MCL 460.10d(4).

[2] In this regard, the PSC's analysis specifically treated the Clean Air Act costs at issue as entirely involving capital expenditures, and Consumers does not challenge that characterization on appeal.

Further, Consumers does not argue that those costs were not in excess of depreciation levels. Thus, it is manifest that the Clean Air Act costs at issue were subject to MCL 460.10d(4). It follows that, contrary to Consumers' position, those costs could not have been included in the calculation of stranded costs in the PSC order being appealed, which was entered in 2002, because MCL 460.10d(4) provides for the PSC's determination of the amounts of such costs in proceedings to begin on or after January 1, 2004. Because of this, the PSC was not obligated to determine the amount of Clean Air Act related capital expenditures attributable to 2000 and 2001 that would or might be eventually recoverable by Consumers under MCL 460.10d(4). Consumers' argument that the PSC allowed or would have allowed recovery of Clean Air Act costs of the type at issue in another case is simply immaterial.

Consumers contends that the PSC erred because its exclusion of capital expenditures for Clean Air Act costs was not limited to "*generation-related* capital expenditures in excess of depreciation." (Emphasis added.) But Consumers' position is inconsistent with the plain language of MCL 460.10d(4). The term "generation-related" does not appear in that statutory provision, which in relevant part applies to all "capital expenditures in excess of depreciation," i.e., it encompasses capital expenditures regardless of whether they are "generation-related." Thus, we reject this argument as well.

In sum, given the plain language of MCL 460.10d(4), Consumers has not established any error based on the PSC's exclusion of the Clean Air Act costs at issue in its determination of Consumers' net stranded costs for 2000 and 2001.

IV. SECURITIZATION OFFSET FOR ROA CUSTOMERS

Consumers next argues that the PSC erred in its continuation of a credit for ROA customers to offset the securitization charges imposed on those customers. We agree in part and disagree in part.

### A. INAPPLICABILITY OF RES JUDICATA AND COLLATERAL ESTOPPEL

Contrary to the Attorney General's position, the doctrines of res judicata and collateral estoppel are inapplicable in this ratemaking context. The doctrine of res judicata "applies to quasi-judicial administrative decisions." *Wayne Co v Detroit*, 233 Mich App 275, 277; 590 NW2d 619 (1998). Similarly, the doctrine of collateral estoppel applies to "unappealed administrative determinations *that are adjudicatory in nature* and where . . . a method of appeal is provided." *Champion's Auto Ferry, supra* at 712 (emphasis added). In *Pennwalt Corp v Pub Service Comm*, 166 Mich App 1, 7-9; 420 NW2d 156 (1988), this Court determined that the doctrines of res judicata and collateral estoppel were inapplicable to the fixing and regulating of rates by the PSC because this is a legislative function, not a judicial one.[3] Thus, because the relevant determinations by the

---

[3] The *Pennwalt Corp* panel stated that "res judicata and collateral estoppel cannot apply in the pure sense" in the ratemaking context. *Pennwalt Corp, supra* at 9. Read in isolation that might seem to imply that the doctrines apply to some limited extent. But the panel previously stated that these doctrines only apply to administrative decisions that are "adjudicatory in nature . . . ." *Id.* at 7. The panel thereafter stated that "[f]ixing and regulating rates is a legislative function, not a judicial one." *Id.* at 8. Thus, we read *Pennwalt Corp* as holding that the doctrines of res judicata and collateral estoppel are inapplicable to ratemaking decisions by the PSC. The panel in that case also stated that an issue regarding the reasonableness of certain costs did not have to be "completely relitigated" where that precise issue was litigated in a prior PSC case, but it was

PSC regarding the securitization offset for ROA customers were part of its ratemaking function, i.e., they directly related to the overall rates to be paid by ROA customers, any prior determination of the matter by the PSC cannot be binding under the doctrines of res judicata and collateral estoppel.

### B. MCL 460.10d(6) AND (7)

Construction and application of MCL 460.10d(6) and (7)[4] are critical to resolution of this issue. MCL 460.10d(6) and (7) provide:

(6) Except for savings assigned to the low-income and energy efficiency fund under subsection (7), securitization savings greater than those used to achieve the 5% rate reduction under subsection (1) [i.e., the five percent rate reduction for residential customers mandated by MCL 460.10d(1)[5]] shall be allocated by the commission to further rate reductions or to reduce the level of any charges

---

appropriate to place the burden on the plaintiff to establish by new evidence or evidence of changed circumstances that the costs were unreasonable. *Id.* at 9. But, as will be explained, in contrast to the factual issue in *Pennwalt Corp* regarding the reasonableness of certain costs, the present issue regarding the securitization offset for ROA customers turns on a question of law. Thus, a requirement for Consumers to come forward with new evidence cannot sensibly be applied to this issue. Rather, the critical point is simply that the doctrines of res judicata and collateral estoppel are inapposite to make any explicit or implicit resolution by the PSC in a prior case of the permissibility of some or all of the securitization offset for ROA customers binding in this case.

[4] This is the current codification of these statutory provisions as they went into effect on December 20, 2002, notably the same date as the PSC opinion and order being appealed in this case. Substantively identical statutory language was previously codified as MCL 460.10d(5) and (6). In addressing this matter, the PSC referred to the current codification of these statutory provisions.

[5] MCL 460.10d(1) requires the PSC to "establish the residential rates for each electric utility with 1,000,000 or more retail customers in this state as of May 1, 2000 that will result in a 5% rate reduction from the rates that were authorized or in effect on May 1, 2000."

authorized by the commission to recover an electric utility's stranded costs. The commission shall allocate approved securitization, transition, stranded, and other related charges and credits in a manner that does not result in a reallocation of cost responsibility among the different customer classes.

(7) If securitization savings exceed the amount needed to achieve a 5% rate reduction for all customers, then, for a period of 6 years, 100% of the excess savings, up to 2% of the electric utility's commercial and industrial revenues, shall be allocated to the low-income and energy efficiency fund administered by the commission. The commission shall establish standards for the use of the fund to provide shut-off and other protection for low-income customers and to promote energy efficiency by all customer classes. The commission shall issue a report to the legislature and the governor every 2 years regarding the effectiveness of the fund.

We disagree with Consumers' argument that MCL 460.10d(7) requires all securitization savings in excess of those needed to fund a five percent residential rate reduction to be used first to achieve a five percent rate reduction for all customers. MCL 460.10d(6) plainly allows the PSC to allocate such "excess" securitization savings "to further rate reductions *or* to reduce the level of any charges authorized by the commission to recover an electric utility's stranded costs." (Emphasis added.) Further, nothing in MCL 460.10d(7) requires excess securitization savings to first be used to achieve a five percent rate reduction for all customers. Rather, MCL 460.10d(7) merely requires that, if securitization savings "exceed the amount needed to achieve a 5% rate reduction for all customers," then a certain amount of such securitization savings must be allocated to the Low-Income and Energy Efficiency Fund. Accordingly, we reject Consumers' argument because it is contrary to the plain language of MCL 460.10d(6) and (7). See

*Nastal v Henderson & Assoc Investigations, Inc*, 471 Mich 712, 720; 691 NW2d 1 (2005).

We agree, however, with Consumers that, as a matter of law, the PSC in effect improperly treated ROA customers' securitization charges in their entirety as flatly involving the recovery of "stranded costs," so that securitization savings could be used to offset those charges. As a starting point, the overall framework for securitization involves incumbent electric utilities recovering their "qualified costs" through the imposition of securitization charges on their customers (including ROA customers). See MCL 460.10i(3); MCL 460.10j(1)(a). Critical to the resolution of this issue is the meaning of "qualified costs" as opposed to that of "stranded costs" and particularly, as will be set forth, our conclusion that not all qualified costs constitute stranded costs. MCL 460.10h(g) defines "qualified costs" as

> an electric utility's regulatory assets as determined by the commission, adjusted by the applicable portion of related investment tax credits, plus any costs that the commission determines that the electric utility would be unlikely to collect in a competitive market, including, but not limited to, retail open access implementation costs and the costs of a commission approved restructuring, buyout or buy-down of a power purchase contract, together with the costs of issuing, supporting, and servicing securitization bonds and any costs of retiring and refunding the electric utility's existing debt and equity securities in connection with the issuance of securitization bonds. Qualified costs include taxes related to the recovery of securitization charges.

In contrast to this express statutory definition of "qualified costs," we have found no express statutory definition of "stranded costs." However, the Legislature granted the PSC broad power to determine stranded costs in MCL 460.10a(1), and we defer to any reason-

able construction of this term by the PSC. *Champion's Auto Ferry, supra* at 708. In PSC Case No. U-11290, the PSC defined "stranded costs" as costs incurred during the regulated era that will be above market prices and costs necessary to facilitate the transition to competitive markets. The PSC identified five categories of stranded costs: (1) regulatory assets, consisting of unrecovered costs of demand-side management programs and other similar costs, (2) capital costs of nuclear plants, (3) contract capacity costs arising from power purchase agreements, (4) employee retraining costs, and (5) costs related to the implementation of restructuring. *In re Electric Utility Industry Restructuring,* unpublished opinion and order of the Public Service Commission, issued June 5, 1997 (Case No. U-11290), pp 6-14.

The differing meanings of qualified costs and stranded costs are important because, as set forth above, MCL 460.10d(6) authorizes the use of excess securitization savings for "further rate reductions" or "to reduce the level of any charges authorized by the [PSC] to recover an electric utility's stranded costs," but does not include any language authorizing the use of excess securitization savings to reduce the recovery of qualified costs that do not constitute stranded costs. We note that it appears undisputed, and we consider it beyond reasonable dispute, that use of excess securitization savings to offset securitization charges, which consist of qualified costs, does not constitute a "rate reduction" within the meaning of MCL 460.10d(6). Specifically, MCL 460.10d(6) treats a rate reduction as a category separate from a reduction in other charges, so that the term "rate reduction" as used in that subsection can only reasonably be considered to refer to a reduction in an electric utility's base rates. Thus, use of securitization savings to offset securitization charges,

i.e., to offset customers' payment of qualified costs, is only authorized by MCL 460.10d(6) to the extent that those qualified costs involved a recovery of stranded costs. It follows that the PSC's decision to use securitization savings to completely offset securitization charges for Consumers' ROA customers can only be justified if the qualified costs that make up those securitization charges consist entirely of stranded costs. However, as we will explain, the PSC improperly treated all qualified costs as constituting stranded costs while refusing to consider whether some of the qualified costs at issue were not stranded costs.

In addition, the last sentence of MCL 460.10d(6) provides further support for our conclusion that qualified costs are not identical to stranded costs. Specifically, that sentence provides for the PSC to allocate "approved securitization, transition, stranded, and other related charges and credits" in a certain manner. Importantly, this language enumerates "securitization" and "stranded" charges separately. Thus, to consider securitization charges, i.e., the qualified costs that a utility may recover related to securitization, and stranded costs as identical would be contrary to the principle that statutory language should not be rendered nugatory because doing so would render superfluous the use of the term "securitization" in addition to the term "stranded" as a modifier to "charges and credits" in the last sentence of MCL 460.10d(6). See *Franchino v Franchino*, 263 Mich App 172, 185-186; 687 NW2d 620 (2004).

In this case, the PSC did not determine that the qualified costs, i.e., securitization charges, imposed on Consumers' ROA customers, for which it directed the use of securitization charges to provide an offset, consisted entirely of stranded costs. Indeed, in its order

denying rehearing, the PSC referred to stranded costs and qualified costs as being "closely related, if not always the same . . . ." Put simply, the PSC has taken the position that because qualified costs are closely related or similar to stranded costs, it may treat all qualified costs as stranded costs for purposes of ordering the securitization offset at issue on the basis of its authority under MCL 460.10d(6) to use excess securitization savings to reduce the recovery of charges authorized to recover stranded costs. We reject this position because, as explained above, under MCL 460.10d(6), while excess securitization savings may be used for further rate reductions or to reduce the level of charges to recover stranded costs, there is no statutory authorization to use such securitization savings to reduce the recovery of qualified costs that do not constitute stranded costs even if such costs are "closely related" to stranded costs. The PSC's position regarding this matter is contrary to the principle that "a court may read nothing into an unambiguous statute that is not within the manifest intent of the Legislature as derived from the words of the statute itself." *Roberts, supra* at 63. Thus, the PSC erred by directing the use of excess securitization savings to flatly reduce ROA customers' securitization charges rather than limiting that reduction to the portion of securitization charges attributable to stranded costs.

Thus, we hold that the PSC erred in allowing the securitization offset for ROA customers at issue to the extent that it was based on qualified costs that did not constitute stranded costs. Consistently with the due deference given to the PSC's administrative expertise, *In re Michigan Cable, supra* at 690, we conclude that we must remand this case to the PSC for it to decide as an initial matter how to modify its treatment of this matter in light of this legal error. Specifically, on re-

mand, the PSC first must decide to either (1) determine the part of the securitization offset for ROA customers attributable to stranded costs and only provide an offset for the portion of the securitization charges based on stranded costs or (2) abolish the securitization offset for ROA customers altogether. We also consider it appropriate for the PSC to initially determine what redress, if any, should be granted with regard to amounts already improperly paid to Consumers' ROA customers from excess securitization savings.

Consumers also argues that, in ordering the securitization offset for ROA customers, the PSC violated the last sentence of MCL 460.10d(6), which requires the PSC to "allocate approved securitization, transition, stranded, and other related charges and credits in a manner that does not result in a reallocation of cost responsibility among the different customer classes." However, in light of our decision to remand this case to the PSC, it would be premature to reach this argument. Rather, in deciding its course of action with regard to the securitization offset at issue on remand, the PSC must be mindful of its duty under MCL 460.10d(6) to avoid a reallocation of cost responsibility among different customer classes.

### C. OTHER ARGUMENTS ADVANCED BY CONSUMERS

Consumers also contends that the PSC lacked the authority to order any portion of the securitization offset for ROA customers at issue. We disagree.[6]

---

[6] We address these arguments, despite our decision to remand this case to the PSC, to make clear that none of these arguments requires the PSC to completely abolish the securitization offset at issue as opposed to limiting it to providing an offset for only that portion of the qualified costs constituting stranded costs.

First, Consumers argues that the securitization offset improperly allows ROA customers to bypass securitization charges in violation of MCL 460.10k(2). MCL 460.10k(2) provides:

> A financing order shall include terms ensuring that the imposition and collection of securitization charges authorized in the order are a nonbypassable charge.

In this regard, MCL 460.10h(f) defines a "nonbypassable charge" as "a charge in a financing order payable by a customer to an electric utility or its assignees or successors regardless of the identity of the customer's electric generation supplier." We disagree with Consumers' argument regarding MCL 460.10k(2) because ROA customers are still being billed for securitization charges and are still being required to pay them even if the same amount is refunded to them through the securitization offset. Further, MCL 460.10d(6) specifically authorizes the PSC to use securitization savings to reduce charges authorized by the PSC to recover an electric utility's stranded costs, at least some of which would constitute qualified costs subject to securitization. Thus, MCL 460.10k(2) cannot reasonably be read as precluding the PSC from providing an offset for securitization charges when MCL 460.10d(6) specifically authorizes the PSC to do so with regard to a category of securitization charges.

Consumers further asserts that the securitization offset violates MCL 460.10n(2), which provides:

> The state pledges, for the benefit and protection of the financing parties and the electric utility, that it will not take or permit any action that would impair the value of securitization property, reduce or alter, except as allowed under [MCL 460.10k(3)], or impair the securitization charges to be imposed, collected, and remitted to financing parties, until the principal, interest and premium, and any

other charges incurred and contracts to be performed in connection with the related securitization bonds have been paid and performed in full. Any party issuing securitization bonds is authorized to include this pledge in any documentation relating to those bonds.

However, we see no basis for concluding that the securitization offset violates this provision. Specifically, despite this offset, securitization charges are collected from ROA customers and used for securitization purposes, but then ROA customers are in effect credited or refunded the same amount *from another source*, i.e., excess securitization savings. Thus, the securitization offset does not impair the imposition, collection, or remitting of securitization funds and, accordingly, does not violate MCL 460.10n(2).

Similarly, Consumers argues that the securitization offset violates MCL 460.10i(4), which provides:

A financing order is effective in accordance with its terms, and the financing order, together with the securitization charges authorized in the order, shall be irrevocable and not subject to reduction, impairment, or adjustment by further action of the commission, except as provided under [MCL 460.10k(3).]

However, as discussed above, the securitization charges are actually collected from ROA customers, with Consumers being required to refund an offsetting amount from another source. Thus, the securitization offset does not violate MCL 460.10i(4).

Affirmed in part, reversed in part, and remanded to the PSC for further proceedings consistent with this opinion. We do not retain jurisdiction.