# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* RELIABILITY PLANS OF ELECTRIC
UTILITIES FOR 2017-2021.

---

ASSOCIATION OF BUSINESSES
ADVOCATING TARIFF EQUITY,

       Appellant,

v

MICHIGAN PUBLIC SERVICE COMMISSION,
CONSUMERS ENERGY COMPANY, ENERGY
MICHIGAN, INC., and MICHIGAN ELECTRIC
AND GAS ASSOCIATION,

       Appellees.

FOR PUBLICATION
July 12, 2018
9:00 a.m.

No. 340600
Public Service Commission
LC No. 00-018197

---

*In re* RELIABILITY PLANS OF ELECTRIC
UTILITIES FOR 2017-2021.

---

ENERGY MICHIGAN, INC.,

       Appellant,

v

MICHIGAN PUBLIC SERVICE COMMISSION,
CONSUMERS ENERGY COMPANY, and
MICHIGAN ELECTRIC AND GAS
ASSOCIATION,

       Appellees.

No. 340607
Public Service Commission
LC No. 00-018197

---

Before: METER, P.J., and GADOLA and TUKEL, JJ.

GADOLA, J.

-1-

In Docket No. 340600, appellant Association of Businesses Advocating Tariff Equity (ABATE)[1] appeals as of right the final order of appellee Michigan Public Service Commission (MPSC) in its case no. U-18197. In Docket No. 340607, appellant Energy Michigan, Inc. (Energy Michigan)[2] appeals as of right the same order of the MPSC. In each of these consolidated cases,[3] appellants contend that the MPSC erred by determining that it is empowered by the Legislature under 2016 PA 341 (Act 341) to impose a local clearing requirement upon individual alternative electric suppliers. In Docket No. 340607, Energy Michigan additionally contends that the order of the MPSC purports to impose new rules upon electric providers in this state without the required compliance with Michigan's Administrative Procedures Act (APA), MCL 24.201, *et seq*. We reverse and remand.

## I. BACKGROUND AND FACTS

At the end of 2016, our Legislature enacted new electric utility legislation that included 2016 PA 341 (Act 341). That act added, among other statutory sections, MCL 460.6w. These appeals arise from an order issued by the MPSC as part of its implementation of MCL 460.6w.

By way of background, Michigan's Legislature previously enacted what was known as the Customer Choice and Electricity Reliability Act, 2000 PA 141 and 2000 PA 142, MCL 460.10 *et seq*., to "further the deregulation of the electric utility industry." *In re Application of Detroit Edison Co for 2012 Cost Recovery Plan*, 311 Mich App 204, 207 n 2; 874 NW2d 398 (2015). That act permitted customers to buy electricity from alternative electric suppliers instead of being limited to purchasing electricity from incumbent utilities, such as appellee Consumers Energy Company (Consumers). *Consumers Energy Co v Michigan Pub Serv Comm*, 268 Mich App 171, 173; 707 NW2d 633 (2005). Among the purposes of the act, as amended, is to "promote financially healthy and competitive utilities in this state." MCL 460.10(b).

Also by way of background, the Midcontinent Independent System Operator (MISO) is the regional transmission organization responsible for managing the transmission of electric power in a large geographic area that spans portions of Michigan and 14 other states. To accomplish this, MISO combines the transmission facilities of several transmission owners into a single transmission system. In addition to the transmission of electricity, MISO's functions include capacity resource planning. MISO has established ten local resource zones; most of

---

[1] ABATE describes itself as "an interest group of large energy users representing its members before regulatory and governmental bodies and other organizations that affect Michigan's energy pricing, reliability, and terms and conditions of service." https://abate-energy.org.

[2] Energy Michigan describes itself as a group devoted to the protection and promotion of "alternative and independent power supply, cogeneration, advanced energy industries and their customers." Energy Michigan intervenes in Michigan Public Service Commission cases affecting those industries. https://energymichigan.org.

[3] These appeals were consolidated on this Court's own motion. *In re Reliability Plans of Electric Utilities for 2017-2021*, unpublished order of the Court of Appeals, entered November 15, 2017 (Docket Nos. 340600; 340607).

Michigan's lower peninsula is located in MISO's local resource zone 7, while the upper peninsula is located in MISO's local resource zone 2.

Each year, MISO establishes for each alternative electric supplier in Michigan the "planning reserve margin requirement."[4] MISO also establishes the "local clearing requirement."[5] Under MISO's system, there generally are no geographic limitations on the capacity resources that may be used by a particular supplier to meet its planning reserve margin requirement. That is, MISO does not impose the local clearing requirement upon alternative electric suppliers individually, but instead applies the local clearing requirement to the zone as a whole. Each individual electricity supplier is not required by MISO to demonstrate that its energy capacity is located within Michigan, as long as the zone as a whole demonstrates that it has sufficient energy generation located within Michigan to meet federal requirements.

MISO also serves as a mechanism for suppliers to buy and sell electricity capacity through an "auction." This allows for the exchange of capacity resources across energy providers and resource zones. The MISO auction is conducted each year for the purchase and sale of capacity for the upcoming year, which allows suppliers to buy and sell enough capacity to meet their planning reserve margin requirement and allows each zone as a whole to meet the zone's local clearing requirement.

At the end of 2016, our Legislature enacted Act 341, in part adding MCL 460.6w, which imposes resource adequacy requirements upon electric service providers in Michigan and imposes certain responsibilities upon the MPSC. Under MCL 460.6w(2), the MPSC is required under certain circumstances to establish a state reliability mechanism. That section provides, in relevant part:

> If, by September 30, 2017, the Federal Energy Regulatory Commission does not put into effect a resource adequacy tariff that includes a capacity forward auction or a prevailing state compensation mechanism, then the commission shall establish a state reliability mechanism under subsection (8). MCL 460.6w(2).

---

[4] Act 341 defines "planning reserve margin requirement" as "the amount of capacity equal to the forecasted coincident peak demand that occurs when the appropriate independent system operator footprint peak demand occurs plus a reserve margin that meets an acceptable loss of load expectation as set by the commission or the appropriate independent system operator under subsection (8)." MCL 460.6w(12)(e).

[5] Act 341 defines "local clearing requirement" to mean "the amount of capacity resources required to be in the local resource zone in which the electric provider's demand is served to ensure reliability in that zone as determined by the appropriate independent system operator for the local resource zone in which the electric provider's demand is served and by the commission under subsection (8)." MCL 460.6w(12)(d).

The parties agree that because the Federal Energy Regulatory Commission did not put into effect the MISO-proposed tariff, the MPSC is required by section 6w(2) to establish a state reliability mechanism. A "state reliability mechanism" is defined by the statute as "a plan adopted by the commission in the absence of a prevailing state compensation mechanism to ensure reliability of the electric grid in this state consistent with subsection (8)." MCL 460.6w(12)(h). The state reliability mechanism is to be established consistent with section 6w(8), which provides, in relevant part, that the MPSC shall:

> (b) Require . . . that each alternative electric supplier, cooperative electric utility, or municipally owned electric utility demonstrate to the commission, in a format determined by the commission, that for the planning year beginning 4 years after the beginning of the current planning year, the alternative electric supplier, cooperative electric utility, or municipally owned electric utility owns or has contractual rights to sufficient capacity to meet its capacity obligations as set by the appropriate independent system operator, or commission, as applicable. One or more municipally owned electric utilities may aggregate their capacity resources that are located in the same local resource zone to meet the requirements of this subdivision. One or more cooperative electric utilities may aggregate their capacity resources that are located in the same local resource zone to meet the requirements of this subdivision. A cooperative or municipally owned electric utility may meet the requirements of this subdivision through any resource, including a resource acquired through a capacity forward auction, that the appropriate independent system operator allows to qualify for meeting the local clearing requirement. A cooperative or municipally owned electric utility's payment of an auction price related to a capacity deficiency as part of a capacity forward auction conducted by the appropriate independent system operator does not by itself satisfy the resource adequacy requirements of this section unless the appropriate independent system operator can directly tie that provider's payment to a capacity resource that meets the requirements of this subsection. By the seventh business day of February in 2018, an alternative electric supplier shall demonstrate to the commission, in a format determined by the commission, that for the planning year beginning June 1, 2018, and the subsequent 3 planning years, the alternative electric supplier owns or has contractual rights to sufficient capacity to meet its capacity obligations as set by the appropriate independent system operator, or commission, as applicable. If the commission finds an electric provider has failed to demonstrate it can meet a portion or all of its capacity obligation, the commission shall do all of the following:
>
> (i) For alternative electric load, require the payment of a capacity charge that is determined, assessed, and applied in the same manner as under subsection (3) for that portion of the load not covered as set forth in subsections (6) and (7). . . . [MCL 460.6w(8)(b) (emphasis added).]

Thus, section 6w(8)(b) requires each alternative electric supplier, cooperative electric utility, and municipally owned electric utility to demonstrate to the MPSC that it has sufficient capacity to meet its "capacity obligations." The statute does not define "capacity obligations," but in section 6w(8)(c), the statute provides that:

(c)  In order to determine the capacity obligations, [the MPSC shall] request that the appropriate independent system operator provide technical assistance in determining the local clearing requirement and planning reserve margin requirement.  If the appropriate independent system operator declines, or has not made a determination by October 1 of that year, the commission shall set any required local clearing requirement and planning reserve margin requirement consistent with federal reliability requirements.  [MCL 460.6w(8)(c).]

Section 6w(8)(b) also provides that municipally owned electric utilities are permitted to "aggregate their capacity resources that are located in the same local resource zone to meet the requirements of this subdivision" and that cooperative electric utilities are permitted to "aggregate their capacity resources that are located in the same local resource zone to meet the requirements of this subdivision."  Section 6w(8)(b) also permits a cooperative or municipally owned electric utility to "meet the requirements of this subdivision through any resource, including a resource acquired through a capacity forward auction, that [MISO] allows to qualify for meeting the local clearing requirement."  Section 6w(8)(b), however, does not include a similar provision for alternative electric suppliers and is, in fact, silent as to whether alternative electric suppliers may aggregate their capacity resources that are located in the same local resource zone to meet the requirements of the subdivision.

MCL 460.6w(3) directs the MPSC to establish a capacity charge that a provider must pay if it fails to satisfy the capacity obligations established under section 6w(8).  Section 6w(6), however, directs that no capacity charge be assessed against an alternative electric supplier who demonstrates that "it can meet its capacity obligations through owned or contractual rights to any resource that the appropriate independent system operator[6] allows to meet the capacity obligation of the electric provider.  The preceding sentence shall not be applied in any way that conflicts with a federal resource adequacy tariff, when applicable."  MCL 460.6w(6).

After the enactment of Act 341, the MPSC worked collaboratively in a workgroup process to implement MCL 460.6w.  On September 15, 2017, the MPSC issued an order in its case number U-18197, imposing new requirements on alternative electric suppliers as part of its implementation of MCL 460.6w.  Among the holdings of the MPSC in that order, the MPSC determined that MCL 460.6w authorizes it to impose a local clearing requirement upon individual alternative electric suppliers.[7]  ABATE and Energy Michigan challenge this

---

[6] MCL 460.6w(12)(a) defines the "appropriate independent system operator" as MISO.

[7] This decision was made in the context of competing interests between large public utilities, which contend that alternative electric suppliers are not investing in the energy infrastructure of Michigan, and therefore are not contributing to long-term energy reliability in the state, and smaller alternative electric suppliers, who provide lower cost electricity to customers by relying in part on capacity generated outside of Michigan.  Large public utilities contend that their costs are higher because of the investment they make in long-term energy production in Michigan, while alternative electric suppliers contend that if they are required to rely almost exclusively on

interpretation of MCL 460.6w as erroneous, while Consumers supports the decision of the MPSC. Energy Michigan further challenges the new requirements imposed by the MPSC as improperly implemented without compliance with the APA.

## II. ANALYSIS

## A. RIPENESS

As an initial consideration, we address the assertion by the MPSC and Consumers that the issue in this appeal related to the imposition of a local clearing requirement is not yet ripe for resolution by this Court. They contend that the September 15, 2017 order of the MPSC in U-18197 did not impose a local clearing requirement on individual alternative electric suppliers, but instead merely announced that the MPSC has the authority to do so. The MPSC and Consumers assert that until the MPSC takes the final step of imposing a specific local clearing requirement upon an individual alternative electric supplier, the question whether the MPSC has the authority to do so is not ripe for review. We disagree.

The ripeness doctrine requires that an actual injury be sustained by the plaintiff. *Van Buren Charter Twp v Visteon Corp*, 319 Mich App 538, 554; 904 NW2d 192 (2017). "The doctrine of ripeness is designed to prevent 'the adjudication of hypothetical or contingent claims before an actual injury has been sustained.' " *Huntington Woods v Detroit*, 279 Mich App 603, 615; 761 NW2d 127 (2008), quoting *Mich Chiropractic Council v Comm'r of the Office of Fin and Ins Servs*, 475 Mich 363, 371 n 14; 716 NW2d 561 (2006), overruled on other grounds *Lansing Sch Ed Ass'n*, 487 Mich 319. "A claim is not ripe if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Citizens Protecting Michigan's Constitution v Secretary of State*, 280 Mich App 273, 282; 761 NW2d 210 (2008).

To determine whether an issue is ripe for review, we assess "whether the harm asserted has matured sufficiently to warrant judicial intervention." *People v Bosca*, 310 Mich App 1, 56; 871 NW2d 307 (2015) (citation omitted); see also *Dep't of Social Services v Emmanuel Baptist Preschool*, 434 Mich 380, 412 n 48; 455 NW2d 1 (1990) (CAVANAGH J., concurring). In making this assessment, this Court must balance any uncertainty of whether a party will actually suffer future injury against the potential hardship of denying anticipatory relief. *People v Robar*, 321 Mich App 106, 128; 910 NW2d 328 (2017). This Court will find an issue ripe for review when it is a "threshold determination," the resolution of which is not dependent upon any further decision by the MPSC. *Citizens*, 280 Mich App 282-283; see also *Mich United Conservation Clubs v Secretary of State*, 463 Mich 1009; 625 NW2d 377 (2001) (controversy was ripe for review when it involved a "threshold determination" whether petitions met constitutional prerequisites and was not dependent upon the Board of Canvassers' counting or consideration of petitions).

---

capacity produced within the state, they will be forced to leave the market in Michigan and consumer choice for electricity will effectively be at an end.

A review of the MPSC's September 15, 2017 order in this case demonstrates that the MPSC has not merely announced that it has the authority to impose a local clearing requirement on individual alternative electric suppliers; it has announced its decision to assert that authority, leaving only the methodology of the exercise of that authority to chance. In its earlier June 15, 2017 order in its case U-18197, and reiterated in its September 15, 2017 order, the MPSC stated that "the Commission finds that a locational requirement is required under Section 6w and that a locational requirement applicable to individual LSEs is allowed as part of the capacity obligations set forth by the Commission pursuant to Section 6w in order to ensure all providers contribute to long-term resource adequacy in the state." The MPSC's September 15, 2017 order further states that "a properly designed locational requirement applied to individual load serving entities as part of a demonstration that capacity obligations have been met is consistent with [the statute's] requirements." In light of these determinations by the MPSC, the alleged harm in this case does not rest upon contingent future events that may not occur as anticipated or at all; the decision to apply a locational requirement to individual alternative electric suppliers has already been made, with the only remaining variable being the methodology the MPSC will employ. There is thus little uncertainty about whether the asserted harm will occur, and we weigh that factor against the potential hardship of denying anticipatory relief. *Robar*, 321 Mich App at 128.

We conclude that the harm asserted in this case warrants judicial intervention. As in *Citizens*, the decision of the MPSC in its September 15, 2017 order that it has the authority to impose a local clearing requirement on individual alternative electric suppliers is a "threshold determination" ripe for our consideration given that the resolution of the issue is not dependent upon any further decision by the MPSC. *Citizens*, 280 Mich App 282-283; see also *Mich United Conservation Clubs*, 463 Mich 1009. We therefore hold that the question whether the MPSC erred in determining that it has statutory authority to impose a local clearing requirement upon individual alternative electric suppliers is ripe for our review.

## B. STANDARD OF REVIEW

When reviewing an order of the MPSC, this Court generally references MCL 462.25, which states:

> All rates, fares, charges, classification and joint rates fixed by the commission and all regulations, practices and services prescribed by the commission shall be in force and shall be prima facie, lawful and reasonable until finally found otherwise in an action brought for the purpose pursuant to the provisions of section 26 of this act, or until changed or modified by the commission as provided for in section 24 of this act.

See, e.g., *Attorney General v Pub Serv Comm*, 269 Mich App 474, 479; 713 NW2d 290 (2006). In addition, this Court generally notes that as a reviewing court, we give due deference to the administrative expertise of the MPSC. See, e.g., *Attorney General v Pub Serv Comm No. 2*, 237 Mich App 82, 88; 602 NW2d 225 (1999). In this case, however, appellants challenge whether a specific holding of the MPSC in its final order in its case no. U-18197 exceeds the authority of the MPSC granted by law.

-7-

To be valid, a final order of the MPSC must be authorized by law, and also must be supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28; *Attorney General v Pub Serv Comm*, 165 Mich App 230, 235; 418 NW2d 260 (1988). Agencies have authority to interpret the statutes that they administer and enforce, *Clonlara, Inc v State Board of Ed*, 442 Mich 230, 240; 501 NW2d 88 (1993), and we respectfully consider an agency's interpretation of a statute that it is empowered to execute, and will not overrule that construction absent cogent reasons. *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 103; 754 NW2d 259 (2008). But the construction the MPSC gives to a statute is not binding on the courts. *Id.* Ultimately, the statutory language itself is controlling, *id.* at 108, and this Court will neither abandon nor delegate its responsibility to determine legislative intent. *Consumers Energy Co,* 268 Mich App at 174-175. Moreover, we review de novo issues of statutory interpretation, *Uniloy Milacron USA Inc v Dep't of Treasury*, 296 Mich App 93, 96; 815 NW2d 811 (2012), including the MPSC's determinations regarding the scope of its own authority. *Consumers Power Co v Pub Serv Commission*, 460 Mich 148, 157; 596 NW2d 126 (1999); *In re Application of Consumers Energy Co to Increase Rates*, 316 Mich App 231, 237; 891 NW2d 871 (2016). In sum, when considering the construction given to a statute by an agency, our ultimate concern is the proper construction of the plain language of the statute regardless of the agency's interpretation, *Rovas*, 482 Mich at 108, and our primary obligation is to discern and give effect to the Legislature's intent. *City of Coldwater v Consumers Energy Co*, 500 Mich 158, 167; 895 NW2d 154 (2017).

## C. MCL 460.6w

The MPSC, in its September 15, 2017 order, held that MCL 460.6w authorizes it to impose a local clearing requirement on individual alternative electric suppliers. ABATE and Energy Michigan challenge this interpretation of MCL 460.6w as erroneous. We agree with ABATE and Energy Michigan.

The MPSC has no common law powers and possesses only the authority granted to it by the Legislature. *Consumers Power Co*, 460 Mich at 155. In addition, we strictly construe the statutes that confer power upon the MPSC, and that power must be conferred by "clear and unmistakable language." *Id.*, quoting *Union Carbide Corp v Public Service Comm*, 431 Mich 135, 151; 428 NW2d 322 (1988). Accordingly, "powers specifically conferred on an agency cannot be extended by inference; . . . no other or greater power was given than that specified." *Herrick Dist Library v Library of Mich*, 293 Mich App 571, 582-583; 810 NW2d 110 (2011) (quotation marks and citations omitted). In addition, when construing the statutes empowering the MPSC, this Court does not weigh the economic or public policy factors underlying the decisions of the MPSC; those concerns are the province of the Legislature. *Consumers Power Co*, 460 Mich at 156. Instead, our concern is the question of law presented to us, the "statutory authority of the [MPSC] in the light of the facts before us . . . ." *Huron Portland Cement Co v Pub Serv Comm*, 351 Mich 255, 262; 88 NW2d 492 (1958).

The MPSC's September 15, 2017 order provides that the order "establishes the format and requirements for electric providers in the state to make demonstrations to the Commission that they have sufficient electric capacity arrangements pursuant to Section 6w" of Act 341. In that order, the MPSC asserts that it is implementing a law administered by the agency, that it has the authority to impose a methodology on all electric load serving entities active in the state, and

specifically, that "the Commission finds that a locational requirement is required under Section 6w and that a locational requirement applicable to individual [load serving entities] is allowed as part of the capacity obligations set forth by the commission pursuant to Section 6w in order to ensure all providers contribute to long-term resource adequacy in the state."

In the order, the MPSC reasons that because the statute refers to capacity obligations only in the context of the obligations of individual providers, the statute's local clearing requirement should likewise be understood to apply to individual providers. Quoting its earlier order, the MPSC order provides, in relevant part:

> As defined in Section 6w(12)(d), "local clearing requirement" means "the amount of capacity resources required to be in the local resource zone in which the electric provider's demand is served to ensure reliability in that zone as determined by the appropriate independent system operator for the local resource zone in which the electric provider's demand is served and by the commission under subsection (8)." As noted above, in requesting assistance from MISO in determining capacity obligations, the Commission is tasked with requesting technical assistance in determining this local clearing requirement.
>
> Section 6w(8) also requires individual electric providers to demonstrate to the Commission that they can meet capacity obligations. The Commission is directed to require each electric provider to demonstrate that it "owns or has contractual rights to sufficient capacity to meet its capacity obligations as set by the appropriate independent system operator, or commission, as applicable" four years into the future. These capacity obligations necessarily include a local clearing requirement.
>
> It is clear that the statute requires the Commission to create capacity obligations, that these capacity obligations include a locational requirement, and that the Commission, in setting locational capacity obligations, is allowed to require a demonstration by individual electric providers that the resources that they use to meet their capacity obligations meet a local clearing requirement. The Commission acknowledges the inter-relatedness of the MISO and Section 6w capacity demonstration processes, but also points out that these are distinct activities. These activities should be harmonized to the extent practicable, but the fundamental responsibility of the Commission is to meet Michigan's statutory obligations.
>
> Thus, the Commission finds that a locational requirement is required under Section 6w and that a locational requirement applicable to individual LSEs is allowed as part of the capacity obligations set forth by the Commission pursuant to Section 6w in order to ensure all providers contribute to long-term resource adequacy in the state.

The MPSC and Consumers urge us to read the provisions of MCL 460.6w as bestowing upon the MPSC authority to impose a local clearing requirement upon individual alternative electric suppliers. They reason that section 6w(8)(c) suggests that the "capacity obligations" of

alternative electric suppliers are required to be based in part upon the local clearing requirement. The MPSC and Consumers further reason that because section 6w(8)(b) refers to the capacity obligations with respect to each individual electric provider, it must be inferred that the local clearing requirement was meant to be applied to each alternative electric supplier individually.

We cannot follow the urging of the MPSC and Consumers, however, because a review of the statute reveals that no provision of MCL 460.6w clearly and unmistakably authorizes the MPSC to impose a local clearing requirement upon individual alternative electric providers. We acknowledge that section 6w(8)(b) provides that each electric provider must demonstrate that it owns or has contractual rights to sufficient capacity to meet its capacity obligations as set by the appropriate independent system operator, or the MPSC, as applicable. Section 6w(8)(c) directs that "[i]n order to determine the capacity obligations," the MPSC must "set any required local clearing requirement and planning reserve margin requirement, consistent with federal reliability requirements," and seek technical assistance from MISO in doing so. But although section 6w(8)(c) thus requires the MPSC to determine the local clearing requirement in order to determine capacity obligations, it does not specifically authorize the MPSC to impose the local clearing requirement upon alternative electric suppliers individually. Because the MPSC has only the authority granted to it by the Legislature by "clear and unmistakable language," *Consumers Power Co*, 460 Mich at 155-156, and because authority cannot be extended by inference, *Herrick Dist Library*, 293 Mich App at 582-583, we must decline the invitation to infer such additional authority upon the MPSC in this case.

Moreover, a review of the entire statute suggests that the MPSC is obligated to apply the local clearing requirement in a manner consistent with MISO. A general principle of statutory construction is that a statute must be read as a whole, and that a seemingly ambiguous provision may thereby be clarified in the context of the whole statute. *Id*. Here, a review of the statute as a whole reveals that MCL 460.6w(3) directs the MPSC to establish a capacity charge that a provider must pay if it fails to satisfy the capacity obligations as required under section 6w(8). Section 6w(6), however, directs that no capacity charge be assessed against an alternative electric supplier who demonstrates that "it can meet its capacity obligations through owned or contractual rights to any resource that the appropriate independent system operator (MISO) allows to meet the capacity obligation of the electric provider." MCL 460.6w(6). The parties acknowledge that MISO permits an alternative electric supplier to meet its capacity obligations, including the local clearing requirement, by owning or contracting for capacity resources located outside the applicable local resource zone, and does not require each alternative electric supplier to demonstrate a proportionate share of the local clearing requirement.

Similarly, section 6w(6) constrains the MPSC from assessing any capacity charge in a manner that "conflicts with a federal resource adequacy tariff, when applicable," and section 6w(8)(c) requires that the MPSC set any planning reserve margin or local clearing requirements "consistent with federal reliability requirements." These provisions militate against the MPSC's imposition of any local clearing requirements beyond what MISO has established, and instead impose upon the MPSC a continuing obligation to observe MISO's general practice of imposing local clearing requirements on a zonal, not individual, basis. Thus, reading MCL 460.6w as a whole indicates that the MPSC is directed to impose a local clearing requirement upon alternative electric suppliers in a manner consistent with MISO, and not individually upon alternative electric suppliers.

-10-

The MPSC notes that section 6w(8)(b) allows cooperative or municipally owned electric utilities to "aggregate their capacity resources that are located in the same local resource zone" for purposes of satisfying their capacity obligations, and further allows those entities to resort to "any resource, including a resource acquired through a capacity forward auction, that [MISO] allows to qualify for meeting the local clearing requirement." The MPSC interprets section 6w(8) as follows:

> This provision allowing municipally-owned and cooperative electric utilities to aggregate their resources in order the meet the requirements of Section 6w(8) clearly implies that these utilities would otherwise be required to meet the requirements on an individual basis. The Commission finds that it would be unreasonable to interpret the statute such that this obligation for individual compliance "for meeting the local clearing requirement" is placed solely on municipally-owned and cooperative utilities under Section 6w. The Commission can find nothing in the law, and no rational basis, to indicate an intent to place a local clearing requirement only on non-profit utilities. Instead, the law is more logically understood to require that all individual utilities be treated similarly in terms of requirements, and that the aggregation option was intended to assist nonprofit utilities (many of which are small) to comply more easily. Thus, this language further supports the Commission's interpretation that a locational requirement is authorized and may be applied to individual electric providers.

The MPSC argues that because section 6w(8)(b) is silent[8] as to whether an alternative electric supplier may similarly aggregate its resources, the intent of the statute must be to permit the imposition of a local clearing requirement upon individual alternative electric suppliers. Again, however, reaching this conclusion requires the inference that section 6w permits the MPSC to establish a capacity obligation that includes an individual local clearing requirement contrary to that imposed by MISO. Because we must strictly construe the statutes that confer power upon the MPSC, and that power may not be inferred but instead must be conferred by "clear and unmistakable language," we conclude that MCL 460.6w does not authorize the MPSC

---

[8] Actually, the law "is more logically understood" by reference to its own terms. The more logical interpretation of those terms is that the Legislature authorized cooperative or municipally owned electric utilities to aggregate their resources in order to meet the local clearing requirement. We will not infer from the Legislature's failure to impose the local clearing requirement on individual alternative electric suppliers, i.e. the Legislature's *silence*, that it, in fact, intended to impose the local clearing requirement on individual alternative electric suppliers. Given that "Michigan courts determine the Legislature's intent from its *words*, not from its silence," *Donajkowski v Alpena Power Co*, 460 Mich 243, 261; 596 NW2d 574 (1999), the better understanding is, as we have articulated it here, that the Legislature's reference to MISO's standards, which allow the local clearing requirement to be met on a zonal basis, and *no language* imposing the local clearing requirement on individual alternative electric suppliers, means that the MPSC is without authority to impose such a requirement upon individual alternative electric suppliers.

to impose a local clearing requirement upon individual alternative electric suppliers. See *Herrick Dist Library*, 293 Mich App at 582-583.

## D. LEGISLATIVE HISTORY

We further conclude that, were it necessary to look outside the language of the statute in this case to ascertain the intent of the Legislature, the order of the MPSC conflicts with the intent of Act 341 as reflected in that statute's legislative history. When construing a statute, this Court is required to give effect to the intent of the Legislature. *Russel v Detroit*, 321 Mich App 628, 637; 909 NW2d 507 (2017). When statutory language is clear, the intent of the Legislature is clear and we will enforce the statute as written. *Id*. We look outside the plain words of the statute only when ambiguity within the statute requires it, and we do not use legislative history to cloud clear statutory text. *In re Certified Question from US Court of Appeals for Sixth Circuit*, 468 Mich 109, 116; 659 NW2d 596 (2003). A statute is ambiguous only if it creates an irreconcilable conflict with another statutory provision or if its language is equally susceptible to more than one meaning. *Village of Holly v Holly Twp*, 267 Mich App 461, 474; 705 NW2d 532 (2005).

As discussed, any authority granted by statute to the MPSC must be conferred by "clear and unmistakable language," *Consumers Power Co*, 460 at 155-156, and "the powers specifically conferred on an agency cannot be extended by inference." *Herrick Dist Library*, 293 Mich App at 582-583. Here, because the language of MCL 460.6w is unambiguous, we interpret the plain language as reflecting the intent of the Legislature without the need to consider the legislative history, and conclude that MCL 460.6w contains no clear and unmistakable language granting the MPSC authority to impose a local clearing requirement upon individual alternative electric suppliers. The MPSC, however, invites us to interpret the statute as permitting it to assume authority not explicit within the statute. We conclude that even if it were necessary in this case to look beyond the language of the statute to ascertain the intent of the Legislature, the interpretation suggested by the MPSC conflicts with the Legislature's intent when enacting MCL 460.6w as evident in the legislative history of Act 341.

We note that not all legislative history is equally valuable when attempting to ascertain the legislative intent behind statutory language. *In re Certified Question*, 468 Mich 109 at 115 n 5. Our Supreme Court has instructed that the "highest quality of legislative history [is] that [which] relates to an action of the Legislature from which a court may draw reasonable inferences about the Legislature's intent," which includes "actions of the Legislature in considering various alternatives in language in statutory provisions before settling on the language actually enacted." *Id*.

Here, the legislative process leading to the passage of Act 341 lasted for almost 17 months, and involved numerous amendments and bill substitutes. Senate Bill 437 was introduced on July 1, 2015, and proposed substantial amendment of the Michigan Public Service Commission Act, 1929 PA 3, and the Customer Choice and Electricity Reliability Act, 2000 PA 141 and 142. The bill ultimately emerged from the Senate as Senate Substitute 7 (S7), with a new provision that imposed a capacity obligation and demonstration process on alternative electric suppliers, who were required to own or contract for enough capacity resources to meet a

percentage of their proportionate share of the local clearing requirement. For example, S7 provided in section (2)(c), in relevant part:

> An alternative electric supplier, . . . shall . . . demonstrate to the Commission, in a format determined by the commission, that for the planning year . . . the alternative electric supplier, . . . has contractual rights to sufficient dedicated and firm electric capacity to meet the equivalent of 90% of its proportional share of the local clearing requirement.

This version of the bill passed the Senate and was transmitted to the House. On December 15, 2016, the House adopted H4 in place of S7. H4 *removed* the specific language requiring individual alternative electric suppliers to meet a percentage of their proportionate share of the local clearing requirement. H4 also added language to section 6w(6) specifying that an alternative electric supplier could meet its overall capacity obligation with any resource that the appropriate independent system operator [MISO] allows to meet the capacity obligation. The Senate thereafter concurred in H4 and the bill was signed into law. The Legislature thereby rejected statutory language imposing the local clearing requirement upon individual alternative electric suppliers in favor of statutory language that adopts the MISO method of not imposing the local clearing requirement upon individual electric providers.

> In its September 15, 2017 order, the MPSC stated:

> The Commission acknowledges that previous versions of the legislation included a detailed methodology relative to determining the share of a forward locational requirement each provider would have to demonstrate. What changed . . . is not that a locational requirement went away entirely, but that an explicit methodology was removed and replaced with provisions that leave decisions on the methodology of how to establish the locational requirement up to the Commission. . . . [T]he statute gives the Commission flexibility to determine how best to establish a forward locational requirement and the resources that qualify to meet that requirement.

On appeal, the MPSC suggests that "once the Legislature had MISO's . . . long-term resource adequacy plan to use as a guide, Legislators no longer felt the need to provide their own different plans for how to allocate [local clearing requirements] and PRMR," as is apparent from "the addition of requirements that the Commission request MISO's assistance in setting capacity determination and deference to MISO's determinations of what resources would qualify." In sum, the MPSC urges us to read into the statute an implied grant of authority to the MPSC to impose a local clearing requirement on individual alternative electric suppliers even though (1) such authority is not clearly and unmistakably granted by the statute, (2) such an interpretation is contrary to the directive of section 6w that the local clearing requirement be imposed in accordance with MISO's practices, which do not impose the local clearing requirement on individual alterative electric suppliers, and even though (3) the Legislature rejected language granting such authority to the MPSC, removing it from the final draft of the statute ultimately enacted. We decline the invitation to engage in these interpretive gymnastics and return to our ultimate concern and primary objective when reviewing an agency decision interpreting a statute,

-13-

which is the proper construction of the plain language of the statute and to discern and give effect to the Legislature's intent. *Rovas*, 482 Mich at 108; *City of Coldwater*, 500 Mich at 167.

"Where the Legislature has considered certain language and rejected it in favor of other language, the resulting statutory language should not be held to explicitly authorize what the Legislature explicitly rejected." *Bush v Shabahang*, 484 Mich 156, 173-174; 772 NW2d 272 (2009), quoting *In re MCI Telecom Complaint*, 460 Mich 396, 415; 596 NW2d 164 (1999). We therefore will not interpret the language adopted in MCL 460.6w as authorizing what the Legislature explicitly rejected when enacting that statute.

## E. ADMINISTRATIVE PROCEDURES ACT

Energy Michigan also contends that the MPSC, through its September 15, 2017 order, made a series of decisions that are essentially a set of improperly instituted rules. An administrative rule is "an agency regulation, statement, standard, policy, ruling, or instruction of general applicability that implements or applies law enforced or administered by the agency." MCL 24.207. An agency should resort to formal APA rulemaking when establishing policies that "do not merely interpret or explain the statute or rules from which the agency derives its authority," but rather "establish the substantive standards implementing the program." *Faircloth v Family Independence Agency*, 232 Mich App 391, 403-404; 591 NW2d 314 (1999). Under the APA, a "rule" does not include a "rule or order establishing or fixing rates or tariffs," MCL 24.207(c), a "determination, decision, or order in a contested case," MCL 24.207(f), an "interpretive statement" or "guideline," MCL 24.107(h), or a "decision by an agency to exercise or not to exercise a permissive statutory power, although private rights or interests are affected," MCL 24.207(j). "[I]n order to reflect the APA's preference for policy determinations pursuant to rules, the definition of 'rule' is broadly construed, while the exceptions are to be narrowly construed." *AFSCME v Dep't of Mental Health*, 452 Mich 1, 10; 550 NW2d 190 (1996). An agency, however, may not avoid the requirements for promulgating rules by issuing its directives under different labels. See *id*. at 9. Whether an agency policy is invalid because it was not promulgated as a rule under the APA is reviewed by this Court de novo. *In re PSC Guidelines for Transactions Between Affiliates*, 252 Mich App 254, 263; 652 NW2d 1 (2002).

In this case, Energy Michigan contends that the MPSC, in its September 15, 2017 order, in determining that it could impose a local clearing requirement upon individual alternative electric suppliers, in essence enacted rules without complying with the APA. Energy Michigan identifies six such alleged instances, which Energy Michigan notes is not an all-inclusive list, being:

a. Establishment of a formula for determining each electric provider's "total capacity obligation that it will be required to demonstrate that it has owned or contracted resources to satisfy."

b. A restriction on the use of the MISO Planning Resource Auction to meet capacity needs, where the Commission states that it "is also allowing electric providers to plan on up to 5% of their portfolio to be acquired through MISO's annual capacity auction" where no such restriction formerly existed.

c. Setting of the capacity obligation for the years 2018 and 2021 on the basis of the electric providers' Peak Load Contribution ("PLC") for 2018, without any means to adjust that obligation during the four years, by requiring that "[t]hese PLC determinations will ultimately drive the total amount of capacity obligation that an AES will be required to meet in its annual demonstration before the Commission."

d. Imposing a locational requirement for obtaining capacity on individual electric providers which will be required for the 2019 demonstration, by affirming "the Commission's interpretation that a locational requirement is authorized and may be applied to individual electric providers."

e. Asserting authority to reinsert by administrate fiat requirements that were removed from the authorizing statute during the legislative drafting process.

f. And ordering that "[t]he Capacity Demonstration Process and Requirements attached hereto as Attachment A, are approved" without having developed those requirements through the proper rulemaking process.

These allegations of inappropriate rulemaking primarily relate to the MPSC imposing a local clearing requirement on individual alternative electric suppliers.[9] Because we determine that the statute does not provide the MPSC the authority to impose a local clearing requirement on individual alternative electric suppliers, we conclude that it is unnecessary to reach the related issue whether the MPSC's determination concerning the local clearing requirement are improperly promulgated rules.

---

[9] Energy Michigan's challenges under the APA are tied almost entirely to its challenge to the MPSC's imposition of the local clearing requirement on individual electric suppliers. In its Reply Brief to Consumers, Energy Michigan asserts that "[w]hat Energy Michigan is disputing (setting aside the MPSC's unlawful process for implementing its new rules, . . .) is whether or not the Commission has the authority to go beyond MISO's zonal LCR and establish a mandatory individual LCR for each electric provider, something that MISO has not done and that is not present in the federal reliability requirement, but would be a new and unique state-level innovation." We agree with Energy Michigan that this is the focus of the parties' dispute and the nearly exclusive focus of the parties' briefing. To the extent that the challenges under the APA range beyond the question of the local clearing requirement, we decline to reach those issues as not sufficiently developed in light of the brevity of the treatment of those challenges by all parties.

Reversed and remanded for proceedings consistent with this opinion.  We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Patrick M. Meter
/s/ Jonathan Tukel